## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ABDUL G. BURIDI,

*Plaintiff,*

vs.

Case No. 15-CV-1142-EFM

BADR IDBEIS AND CARDIOVASCULAR
HOSPITALS OF AMERICA, LLC,

*Defendants.*

## MEMORANDUM AND ORDER

Plaintiff Abdul G. Buridi brings suit against Defendants Badr Idbies and Cardiovascular Hospitals of America, LLC alleging that Defendants committed fraud and conspired to commit fraud.  These claims arise out of a failed venture for a physician-owned hospital in Indiana. Plaintiff claims that Defendants committed fraud by omission by failing to disclose material facts with respect to equipment lease guarantees in which Plaintiff became a guarantor.  Plaintiff also asserts that Defendants engaged in a civil conspiracy with two other individuals (who are not parties to this lawsuit) to defraud Plaintiff.  Defendants now seek summary judgment.  Because the Court concludes that Plaintiff cannot point to any evidence demonstrating a genuine issue of material fact as to his claims, the Court grants Defendant's Motion for Summary Judgment (Doc. 58).

## I.      Factual and Procedural Background[1]

Plaintiff Abdul G. Buridi ("Buridi") is a physician in the Louisville, Kentucky area. Kentuckiana Medical Center, LLC ("KyMC") is a limited liability company with two members: Defendant Cardiovascular Hospitals of America, LLC ("CHA") and Kentuckiana Investors, LLC ("KI").  Defendant CHA owned 51% of KyMC, and KI owned 49%.

CHA is a Delaware company with its headquarters in Kansas.  Defendant Badr Idbeis, M.D. ("Dr. Idbeis") is a Kansas physician.  He is the CEO and Chairman of the CHA board and holds a majority of the voting shares of CHA.  Dr. Idbeis was one of the co-founders of the Kansas Heart Hospital.   CHA was involved in several other hospitals.   It developed the Louisiana Hospital Center, and it owned and managed the Hawaii Medical Center.  In late 2008 or early 2009, CHA's Louisiana hospital defaulted under the terms of its promissory notes and municipal bonds.  The Louisiana hospital never opened, in part, because of a disagreement among the Louisiana physicians relating to the hospital equipment.  Around the same time as CHA's Louisiana's hospital default, CHA's Hawaii hospital declared bankruptcy.

Dr. Idbeis had a role in developing the CHA business model because he assisted in drafting it and then had different CHA officers make contributions to it. The CHA business model contains the following statement: "Each investor will contribute capital and guarantee debt in proportion to their respective ownership."  The CHA business model was used to solicit prospective investors in the KyMC hospital project.

Plaintiff purchased a single share of KI, which represented a 1.0417% ownership in KI. KI's offering summaries in both 2005 and 2006 state that "the strategic plan of KyMC is to

---

[1]  In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party.

employ a modified version of the hospital model fashioned and implemented by the founders of CHA at the Kansas Heart Hospital in Wichita, Kansas." The offering summaries also disclose that private investment ventures involve a high degree of risk and that there is no assurance that investors will not lose their money. The offering summary regarding the purchase of the real estate upon which KyMC would be built states that KI members will personally guarantee construction loans, but the portion of any loan would not exceed four times the total capital contributions made by the KI member. In addition, it stated that neither CHA nor the members of CHA were obligated to guarantee the construction loans.

Approximately thirty other physicians were members of KI. Christodulos Stavens, M.D. ("Stavens") and Eli Hallal, M.D. ("Hallal) are Kentucky physicians who were members. Stavens and Hallal were the largest shareholders in KI. Stavens owned 12.77% and Hallal owned 13.83% of KI.

The KyMC operating agreement provides for a seven member board of managers, three appointed by CHA, and four appointed by KI. Drs. Stavens and Hallal served as KI's representatives on the KyMC board of managers, and they were Plaintiff's first point of contact for questions regarding KyMC. Plaintiff would also go to Paul Newsom, the CFO of KyMC, with questions. Dr. Idbeis served as the CHA representative on the KyMC board of managers. He was not a member of KI.

Plaintiff testified that he met Dr. Idbeis twice before Plaintiff invested in KI. The first time was at a presentation in which Dr. Stavens introduced the "CHA people." At the second meeting, Dr. Idbeis introduced himself, talked about the health care environment, the benefits of specialty hospitals versus general hospitals, CHA's activities in developing hospitals like KyMC, his own credentials, and the team available to CHA.

KyMC leased the hospital building and the land on which it would be constructed from Kentuckiana Medical Center Real Estate Investors, LLC ("KMCRE").  KI had a 49.24% interest in KMCRE, and CHA had a 10.25% interest.  KMCRE also sought to sell the rest of the units to physician investors pursuant to a private placement memorandum.

CHA contracted with KyMC to provide certain services with respect to the development of the hospital and entered into a Hospital Development Agreement.  Dr. Stavens was the authorized representative for KyMC and worked with CHA on the development of the hospital. CHA was to communicate with Dr. Stavens.  CHA provided architectural plans, developed site selection, provided staffing models, equipped and provisioned the hospital, helped with advising as to what would be a good process to bid the construction, helped answer questions regarding whether financing and equipment was reasonable or adequate, and helped with the process of opening the hospital.  In addition, CHA oversaw the construction of the hospital.

KyMC was conceived as a sixty-bed general hospital with an emergency room.  But the KyMC hospital was not completed as first represented and envisioned.   Instead, a thirty-six bed hospital was completed.  The original design of the KyMC hospital included an eight bed wing which was left uncompleted, an emergency room, the shell of which was finished, but was never opened, and six operating rooms, not all of which were opened.

Dr. Idbeis and Dr. Stavens were members of the two-person management committee of the KyMC board during the development phase of the hospital before it was opened. They made the decision to move forward with the scaled-back hospital design.  Plaintiff did not know of the decision to proceed with the scaled-back hospital design until after the hospital was constructed. Plaintiff admits that the Hospital Development Agreement designates Dr. Stavens as the

physician owners' representative, and it provides that Dr. Stavens and CHA are authorized to make decisions regarding issues such as the construction of the hospital and change orders.

Under the Hospital Development Agreement, CHA was to advise as to what the necessary and correct equipment was and how to contact financial partners and lenders to procure the equipment. CHA had vendors it had dealt with in the past, and Siemens was CHA's preferred provider for the major equipment. CHA also had prior relationships with the equipment providers that CHA ultimately ended up contacting with respect to the KyMC project, including Steris Corp., Cardinal Health, and Cerner. Diversied Lending was also located through CHA's efforts.

As part of the equipment financing for the KyMC project, the equipment lease companies required that certain guarantees be executed. CHA executed corporate guarantees and the physician investors executed personal guarantees with respect to the equipment leases for Diversied Lending, Leasing Group, Med One, and Cardinal Health. The physician investors in KI were told that CHA was signing corporate guarantees for their share of the hospital debt.

Plaintiff, along with the other physician investors in KI, were summoned to the lobby of the KyMC hospital at different times to sign the equipment lease guarantees because there was a rush to open the hospital. Dr. Stavens, Dr. Hallal, and potentially Paul Newsom (CFO of KyMC) were there at the time Plaintiff signed the guarantees. Dr. Idbeis was not.

Plaintiff was informed by Dr. Stavens and Dr. Hallal that the physicians were jointly guaranteeing the equipment lease debt, but were doing so on a pro rata basis. The equipment lease guarantees were in fact joint and several liability and not pro rata. Plaintiff states that he would not have signed the guarantees had Dr. Stavens and Dr. Hallal not mispresented these facts. Plaintiff had the opportunity to read the equipment lease guarantee documents. He stated,

"I did have the opportunity to read it, but we were going with the trust of each other and what we were being told."  Plaintiff was not given the guarantees or mailed a copy of the signed guarantees.  Plaintiff requested but never received copies of what he signed.

The hospital equipment leases and associated guarantees were either approved by the full KyMC board or the management committee of the KyMC board.  The KyMC hospital would not have opened if the equipment lease guarantees were not executed.  Dr. Stavens recalled that the KyMC board was aware that signing of joint and several guarantees was different than the original expectation of the KyMC operating agreement.

Beginning in 2007 and 2008, CHA began experiencing financial difficulties.   On December 31, 2007, CHA was insolvent on a technical basis for a balance sheet.  Doug Kell, CHA's CFO from 2001 until mid-October 2008, left his employment because CHA ran out of money. Although CHA went insolvent, Plaintiff was never required to satisfy any portion of CHA's guarantees.

The facts in this paragraph were not specifically set forth in either Defendants' or Plaintiff's factual statements, but the parties included these relevant and important facts in their introductions to their motions.   KyMC apparently opened in August 2009.   It experienced financial difficulties from the beginning and ultimately failed and went bankrupt.   Because KyMC went bankrupt, they defaulted on equipment lease loans through Steris Corporation, Diversified Lending, and Leasing Pool Group II, LLC.  These companies apparently filed suit against the guarantors, one of which was Plaintiff, because of the joint and several liability provisions in the equipment leases.

A $2.89 million non-final judgment was entered on Plaintiff's credit report.  Plaintiff did not have to pay anything to satisfy any of the lease guarantees.

In 2015, Plaintiff filed suit against Defendants Dr. Idbeis and CHA alleging fraud by omission and civil conspiracy.[2]  Plaintiff claims that Defendants committed fraud and conspiracy to commit fraud because they did not disclose the fact that CHA did not have experience in developing or managing hospitals, that KyMC was not going to be constructed per the plans used to solicit investors and obtain construction financing, that the equipment lease guarantees were joint and several liability, and that CHA was balance-sheet insolvent while executing corporate guarantees.  He seeks damages for the money he lost in investing in KI, his attorneys' fees for defending against paying on the equipment lease guarantees, and lost business opportunities that were allegedly caused by the damage to his credit.  Defendants now seek summary judgment on Plaintiff's claims.

## II.       Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[3]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[4]  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[5]  If the movant carries this initial burden, the nonmovant that bears the burden of persuasion at trial may not simply rest on its pleading but must instead "set forth

---

[2] Plaintiff filed a previous lawsuit in Kentucky against Dr. Stavens, Dr. Hallal, KI, Dr. Idbeis, and CHA. Defendants Idbeis and CHA were apparently dismissed from the Kentucky litigation based on a lack of personal jurisdiction.

[3] Fed. R. Civ. P. 56(c).

[4] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[5] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[6]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[7]  The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[8]

### III.    Analysis

#### A.  Fraud by Omission

The parties agree that Kentucky substantive law governs this case because Kentucky is the site of the alleged tort, as well as where Plaintiff claims to have suffered injury.  "[A] fraud by omission claim is grounded in a duty to disclose."[9]  It is "well established that mere silence is not fraudulent absent a duty to disclose."[10]  In Kentucky, a fraud by omission claim contains four elements: (1) the defendant had a duty to disclose a fact, (2) the defendant failed to disclose that fact, (3) the defendant's failure to disclose the material fact induced the plaintiff to act, and (4) the plaintiff suffered actual damages.[11]  The Court will only address the first element as it is dispositive.

#### 1.  Duty to Disclose

---

[6] *Id.* (citing Fed. R. Civ. P. 56(e)).

[7] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[8] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[9] *Giddings & Lewis, Inc. v. Industrial Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011).

[10] *Smith v. Gen. Motors Corp.*, 979 S.W.2d 127, 129 (Ky. Ct. App. 1998).

[11] *Rivermont Inn, Inc. v. Bass Hotels Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003).

A duty to disclose facts is created in four situations: (1) a confidential or fiduciary relationship exists between the parties, (2) a statute imposes such a duty, (3) "when a defendant has partially disclosed material facts to the plaintiff but created the impression of full disclosure,"[12] and (4) "where one party to a contract has superior knowledge and is relied upon to disclose same."[13] "When the first circumstance (a fiduciary duty) does not exist, the courts have been careful not to apply the other three circumstances so broadly as to transform everyday, arms-length business transactions into fiduciary relationships."[14] Whether a duty exists is a question of law.[15] In this case, Plaintiff attempts to establish that a duty existed between him and Defendants in three different ways.

a. *Fiduciary or Confidential Relationship*

Plaintiff first argues that a confidential or fiduciary relationship existed between Defendants and himself. He asserts that Defendant CHA was in a confidential relationship with him by virtue of the Hospital Development Agreement and by CHA being the majority owner of KyMC. However, Plaintiff was not a party to the Hospital Development Agreement. Only CHA and KyMC were parties to the contract. Thus, a fiduciary or confidential relationship could not have been created with Plaintiff through this contract. Furthermore, Plaintiff directs the Court to no authority that a fiduciary relationship can be created through contract alone.

Plaintiff also contends that a fiduciary or confidential relationship existed with Defendant Dr. Idbeis because he was the CEO and the face of CHA, he was a member of the KyMC board,

---

[12] *Giddings*, 348 S.W.3d at 747 (citing *Rivermont Inn*, 113 S.W.3d at 641)).

[13] *Id.* at 748 (citing *Smith*, 979 S.W.2d at 129).

[14] *Gresh v. Waste Servs. of Am., Inc.*, 311 F. App'x 766, 772 (6th Cir. 2009).

[15] *Giddings*, 348 S.W.3d at 747.

and a member of the two-person management committee during the developmental phase of the hospital.  Again, Plaintiff does not direct the Court to any authority that these responsibilities would establish a fiduciary or confidential relationship between Dr. Idbeis and Plaintiff. Plaintiff was not a member of CHA of which Dr. Idbeis was the CEO.  Dr. Idbeis was not a member or manager of KI of which Plaintiff held a 1% ownership interest.  CHA and KI were separate entities.  And although KyMC was made up of both CHA and KI, they each held their own interest of 51% and 49% respectively.  Generally, an officer of one corporation does not owe "any kind of direct fiduciary duty to an individual shareholder or member of a different entity."[16]  Furthermore, even if Plaintiff and Dr. Idbeis were involved in the same entity, "it is generally understood that the common-law fiduciary duty owed by members of the board of directors or officers of a corporation runs directly to the corporation and the shareholders/members as a whole."[17]

> In addition, in Kentucky, a fiduciary relationship generally exists when it is established
>
> (1) that the relationship existed before the transaction that is the subject of the action; (2) that reliance was not merely subjective—the aggrieved party trusted the other party to act as a fiduciary and such trust was reasonable under the circumstances; and (3) that the nature of the relationship imposed a duty on the fiduciary to act in the principal's interest, even if action was to the detriment of the fiduciary.[18]

There is no evidence or argument that these elements were met.  Accordingly, Plaintiff cannot establish a duty to disclose facts by CHA or Dr. Idbeis on the basis of a fiduciary or confidential relationship.

---

[16] *Griffin v. Jones*, 2015 WL 4776300, at *4 (Ky. Ct. App. Aug. 14, 2015).

[17] *Id.* (citing 18B Am. Jur. 2d *Corporations* § 1462 (2011)).

[18] *Buridi v. Branch Banking & Trust Co.,* 2013 WL 1309763, at *4, n. 2 (W.D. Ky. Mar. 25, 2013) (citing *In re Sallee*, 286 F.3d 878, 893 (6th Cir. 2002)).

     *b.  Partial Disclosure*

Plaintiff next argues that a duty arose because Defendants only partially disclosed material facts but created the impression of full disclosure.  Plaintiff states that both Defendants disclosed facts regarding the financial condition of CHA and their experience in developing physician-owned hospitals.  Plaintiff says that, in reality, CHA had a troublesome financial position and a relative lack of experience which was evidenced by the failure of the Louisiana and Hawaii hospitals. Thus, Plaintiff contends that Defendants did not fully disclose material facts.

Defendants point out that with regard to CHA's financial condition, Plaintiff's view of the evidence is a bit distorted.  First of all, CHA's financial statements were confidential and were not shared with KI investors.  There is no evidence that CHA ever made financial disclosures, or was required to make financial disclosures, to Plaintiff either before Plaintiff's investment in KI or at the time Plaintiff executed equipment lease guarantees.  Again, it is worth noting that Plaintiff was not a member of CHA, and CHA and KI were separate entities.  Accordingly, there was no partial disclosure with the impression of full disclosure of Defendants' financial condition.

As to CHA's experience in developing physician-owned hospitals, it appears that the demise of CHA's other hospitals occurred after the disclosure of CHA's experience in developing physician-owned hospitals. Thus, at the time Dr. Idbeis made representations regarding CHA's experience in successfully developing hospitals, the disclosure appears to be

full.  Accordingly, Plaintiff cannot establish a duty on the basis of partial disclosure regarding CHA's financial condition and experience in developing physician-owned hospitals.[19]

Plaintiff also asserts that Defendants had an obligation to fully disclose material facts with respect to equipment lease guarantees.  Specifically, Plaintiff contends that Defendants were under an obligation to tell Plaintiff that the equipment lease guarantees were joint and several liability instead of pro rata as he had previously been led to believe.  With regard to Defendant Dr. Idbeis, the evidence demonstrates that Plaintiff only met him twice before Plaintiff invested in KI, and neither of those meetings was of any consequence.  In the first meeting, Dr. Idbeis was introduced but he did not speak.  In the second meeting, Dr. Idbeis gave a presentation about the health care environment, the benefits of specialty hospitals versus general hospitals, CHA's activities in developing hospitals like KyMC, his own credentials, and the team available to CHA.  Dr. Idbeis had no further dealings with Plaintiff.  Plaintiff testified that the only people he spoke with about signing equipment lease guarantees were Dr. Stavens, Dr. Hallel, and Newsom.  Dr. Idbeis had nothing to do with these meetings.  Thus, the evidence does not show that Dr. Idbeis gave the impression of full disclosure while only partially disclosing material facts with regard to equipment lease guarantees.

As to CHA, Plaintiff attempts to impose a duty upon it by referencing written documents made several years before the equipment lease guarantees and to several documents that have no relation to CHA.  Plaintiff references KI's offering summaries, KI's operating agreement, the KyMC operating agreement, and the CHA business model.  First, KI's offering summaries and

---

[19] To the extent that Plaintiff attempts to bring a separate fraud by omission claim that Defendant CHA lacked experience in developing physician-owned hospitals, the same reasoning stated above that Defendant CHA provided full disclosure regarding its experience would be applicable to that claim.

KI's operating agreement have nothing to do with CHA as these documents relate to KI. It is undisputed that CHA is a separate entity from KI.[20]  With regard to the KyMC operating agreement, it is not specifically applicable to Plaintiff because it is applicable to CHA and KI because CHA and KI were the members of KyMC. Finally, Plaintiff states that CHA's business model states that the investor will guarantee debt in proportion to their respective ownership. The CHA business model does indeed state this proposition. But, CHA's material simply provided a model for how it envisioned what an individual's investment would look like. In addition, this document was presented to Plaintiff before investing in KI and several years prior to the execution of equipment lease guarantees.

The Court is cognizant that the written documents envisioned pro rata liability. As noted above, however, most of these documents do not relate to Defendants. In addition, at least one document, the KI offering summaries, included a disclaimer that the investment was highly speculative and involved a high degree of risk. Although disclaimers do not insulate a party from fraud, "they do put the opposing party on notice that projections ought not to be uncritically relied upon."[21]  Furthermore, as will be discussed below, Plaintiff had the ability to read the equipment lease guarantees to see what he was actually entering into.

The evidence demonstrates that Drs. Staven and Hallal specifically told Plaintiff that the equipment lease guarantees would be pro rata.[22] In addition, the evidence demonstrates that Plaintiff believed the equipment lease guarantees were pro rata and not joint and several liability.

---

[20] Dr. Idbeis is also not a member of KI.

[21] *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 550 (Ky. 2009).

[22] The allegations against Drs. Staven and Hallal appear to be more akin to a fraudulent misrepresentation claim rather than a fraud by omission claim.

Although this evidence is uncontroverted, it is unhelpful to Plaintiff's case. First, these facts do not relate to either Defendant in this case. Defendants were not a party to these equipment lease guarantees, and they did not participate in any discussions with Plaintiff regarding equipment leases. Defendant CHA's involvement with Plaintiff is tenuous in that the only possible relation is through the CHA business model or through the KyMC operating agreement applicable to CHA which envisioned pro rata guarantees. And as discussed above, these documents were presented several years before the equipment lease guarantees. Defendant Dr. Idbeis's involvement is even more tenuous as he never spoke with Plaintiff regarding equipment lease guarantees, and it appears that he only met Plaintiff twice.

Furthermore, the evidence demonstrates that Plaintiff could have read the equipment lease guarantees, but he chose not to. "Under Kentucky law, a party who can read and has an opportunity to read the contract which he signs must stand by the words of his contract."[23] "[A] person signing a contract cannot rely blindly on the other parties' statements, but must exercise ordinary care."[24] Again, Defendants played no part in the signing of the equipment lease guarantees. Thus, Defendants had no duty to disclose facts to Plaintiff on the basis of partial disclosure disguised as full disclosure.

   c.   *Superior Contractual Knowledge*

---

[23] *Buridi v. Leasing Group Pool II, LLC*, 447 S.W.3d 157, 179 (Ky. Ct. App. 2014) (quotation marks and citation omitted).

[24] *Stonestreet Farm, LLC v. Buckram Oak Holdings*, 2010 WL 2696278, at *9 (Ky. Ct. App. July 9, 2010). Kentucky law also states that generally "a person who has the opportunity to read a contract, but does not do so and signs the agreement, is bound to the contract terms unless there was some fraud in the process of obtaining his signature." *Cline v. Allis-Chalmers Corp.*, 690 S.W.2d 764, 766 (Ky. Ct. App. 1985). Neither Defendant in this case was involved in obtaining Plaintiff's signature on the equipment lease guarantees. Thus, there is no evidence that they were involved in any fraudulent misrepresentations. And as discussed in detail above, there was no duty to disclose on the basis of partial disclosure.

Finally, Plaintiff argues that Defendants had superior knowledge concerning the equipment lease guarantees and CHA's financial condition which placed the parties on unequal footing. With regard to this duty relating to superior knowledge, it must be premised on the fact that the parties entered into a contract with each other.[25] Plaintiff, however, did not enter into a contract with either Defendant. Thus, there is no contract between the parties and therefore no duty to disclose anything to Plaintiff even if Defendants had superior knowledge.

Thus, the Court concludes that Plaintiff cannot direct the Court to any evidence that Defendants had a duty to disclose to Plaintiff, and Plaintiff's claim for fraud by omission fails because he cannot meet the first element. Because the Court finds that Plaintiff cannot meet the first element, it is unnecessary to consider Defendants' additional arguments that Plaintiff cannot demonstrate causation or damages.

### B.  Civil Conspiracy

"[C]ivil conspiracy is not a free-standing claim; rather, it merely provides a theory under which a plaintiff may recover from multiple defendants for an underlying tort."[26] To prevail on a claim for civil conspiracy, a plaintiff must show "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means."[27] "Kentucky courts have focused on the meaning of 'concerted action.' "[28] Generally, to satisfy this requirement, "there must be proof that the defendants acted

---

[25] *See Giddings*, 348 S.W.3d at 748.

[26] *Stonestreet Farm*, 2010 WL 2696278, at *13.

[27] *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008) (citing *Smith v. Bd. of Educ. of Ludlow*, 94 S.W.2d 321, 325 (1936)).

[28] *Preferred Care of Del., Inc. v. Crocker*, 173 F. Supp. 3d 505, 524 (W.D. Ky. 2016).

tortiuously pursuant to a common design, or that they rendered substantial assistance to others to accomplish the tortious act."[29]   Negligence is insufficient to sustain a civil conspiracy claim.[30]

In this case, there is no underlying tort of fraud for which Defendants to conspire. As noted above, the Court found that Plaintiff cannot establish a fraud by omission claim. Thus, Plaintiff does not have a civil conspiracy claim.   Nevertheless, the Court will briefly address Plaintiff's allegations.

Plaintiff asserts that Defendants conspired with Drs. Staven and Hallal to move forward with a scaled-back hospital design and to obtain the execution of his joint and several liability equipment lease guarantees.   With regard to the scaled-back hospital design, Plaintiff does not identify any unlawful agreement or unlawful means to obtain this goal.   Indeed, Plaintiff admits that the Hospital Development Agreement designated Dr. Stavens and Defendant Dr. Idbeis to make decisions regarding issues on the construction of the hospital.   As to obtaining Plaintiff's signature on the equipment lease guarantees, Plaintiff's specific allegations relate to Drs. Stavens and Hallal, and he provides no evidence of Defendants' involvement.   Plaintiff simply offers speculation and conjecture that Defendants' actions were totally conspiratorial.   Accordingly, Plaintiff cannot establish a civil conspiracy claim.[31]

---

[29] *Id.* (citation omitted).

[30] *Id.*

[31] Defendants also filed a Motion to Exclude or Limit Testimony (Doc. 57).  Given that the Court grants summary judgment in favor of Defendants, this motion is moot.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 58) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude or Limit Testimony (Doc. 57) is **DENIED AS MOOT**.

**IT IS SO ORDERED**.

Dated this 22nd day of November, 2016.

*Eric F Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE